bidder making a bona fide bid on the day that the franchise was offered for sale. It appears incontestably that it made no higher bid than 3½ per cent. of its gross receipts in addition to the annual percentages required by law. In the face of that fact it became necessary for it to show that every advance in the bidding beyond 3¼ per cent. was not a legitimate and binding offer. It did not again compete after this bid of 3½ per cent. was increased by another bidder. The record states: "The bidding proceeded between these three companies until a bid of three and one-half per cent. was offered by the Southern Boulevard Railroad Company, and from this point it was confined to the two other companies. A bid of the North New York City Traction Company of thirty-nine and twelve-sixteenths per cent. had been offered and received." We have examined the record to find some evidence of any of the intermediate bids between 3½ per cent. and 39¹²/₁₆ per cent. having been fraudulent or irregular, but we have failed to discover anything to impeach them, and this consideration is sufficient to dispose of the plaintiff's appeal, and to lead to the affirmance of the judgment, based, as it is, upon the decision of the court that the plaintiff offered to pay only the amount of its bid of 3½ per cent. and the additional statutory percentages, after which offer other and larger percentages were bid and agreed to be paid by the competing defendant corporations, which bids were made in good faith. We think it is too clear for argument that the plaintiff, upon its own showing, had no standing in court to assert any right in this action.

Our attention has been called to certain matters contained in the opinion of the learned judge at special term relating to the legal effect of the bidding after it had reached 39½ per cent. of the whole amount of the gross receipts. These matters are important, but a consideration of the character and effect of that bidding was not necessary to the decision of the court, regard being had to the real ground upon which the conclusion it arrived at concerning the right of the plaintiff to maintain the suit was based. As it was unnecessary to the decision by the court below, so also is it unnecessary that we should take that subject into consideration, and what was said by the learned judge at special term concerning it in his opinion is not to be regarded as anything more than the expression of his personal views, the correctness of which we refrain from passing upon.

The judgment of the court below in dismissing the complaint was right, and is affirmed, with costs. All concur.

---

(3 App. Div. 109.)

MILLIMAN v. ROCHESTER RY. CO.

(Supreme Court, Appellate Division, Fourth Department. March, 1896.)

TRIAL—INSTRUCTIONS—INFERENCE FROM FAILURE TO QUESTION WITNESS FULLY.
    In an action for injuries caused by a collision between plaintiff's buggy
    and defendant's car, where the testimony was conflicting, and plaintiff's
    daughter, who was with him at the time of the injury, had testified on
    the points to which her attention was called by plaintiff's counsel, it

was not reversible error to instruct that, where a witness is put on the stand who knows or may know what the facts are, "and is not called by the person to whom he or she is friendly to swear as to what the facts are," the jury "may, if they see fit, assume that the reason why that witness was not asked a question in regard to the matter is because, if she had been asked, she would not have given a favorable answer." Ward, J., dissenting.

Appeal from special term, Monroe county.

Action by Rowland T. Milliman against the Rochester Railway Company. There was a judgment for defendant, and from an order denying a motion for new trial plaintiff appeals. Affirmed.

Argued before HARDIN, P. J., and FOLLETT, ADAMS, WARD, and GREEN, JJ.

John Van Voorhis, for appellant.
C. J. Bissell, for respondent.

FOLLETT, J.   This action was begun July 7, 1892, to recover damages for a personal injury, and for an injury to plaintiff's horse, harness, and phaeton, caused, it is alleged, by the negligence of defendant's motorman.   September 4, 1891, the plaintiff was riding with his daughter and grandchild, two years old, in a phaeton drawn by one horse.   The top of the carriage was up, and the side and back curtains were closed.   The plaintiff sat on the right side, his daughter on the left side, and the child between them.   They were driving eastward on Monroe avenue, on the south side of defendant's track.   Meigs street crosses Monroe avenue, and, at the place where these streets cross, one of the defendant's east-bound cars collided with the plaintiff's phaeton, overturning and injuring it, and also injuring the plaintiff and his horse.   The accident occurred about midday.   The car was going eastward, and moving about the same rate of speed as the plaintiff's horse,—five to seven miles an hour.   A steam roller stood on the south side of the avenue, and near the Meigs street crossing.   As the plaintiff's horse approached he was frightened by the escaping steam, shied suddenly to the left (north), and entered on defendant's track.   The plaintiff testified that the car followed along behind the phaeton for 125 or 150 feet, and ran into his phaeton. He testified that the first notice of danger he had was the screams of persons behind the wagon, which his daughter heard first, and called his attention to; that he immediately pulled his horse to the left, to get clear of the track, but, before he got off, was run into.   The daughter was called as a witness for her father, and testified that she heard no gong, but heard voices shouting, and that immediately afterwards the collision occurred.   She was not asked by the counsel of either litigant how long after the horse entered upon the track, or how far they had traveled on it, before the collision occurred.   Four witnesses called by the defendant testified that the collision occurred immediately after the horse shied onto the track, and three of them (the motorman and two citizens) testified that before the collision the phaeton was being driven along on the south side of the track, and not more than

15 or 20 feet ahead of the car; that both were traveling at about the same rate of speed, and when the horse saw the escaping steam he shied away from it, and the collision occurred.

The liability of the defendant turned upon the issue whether the collision occurred immediately after the horse entered upon the track, or whether the car followed the phaeton for 125 feet or more, overtook it, and ran it down. The plaintiff's daughter was not examined upon this question when on the stand, nor was she recalled after this vital issue had been so clearly presented by the defendant's witnesses. The learned trial judge, in his charge, clearly presented this issue, and, after some appropriate remarks upon the burden of proof, called the attention of the jury to the fact that the plaintiff's daughter had not been examined on this issue, although she had had the same opportunity of knowing the facts as the plaintiff, and charged that this omission might be taken into account, in determining on which side the truth lay. The learned counsel for the plaintiff excepted to this instruction, and now urges that it was error, for which a new trial should be granted. In case a litigant fails to produce a person known to be friendly to him and to his cause, who is so situated that he must have knowledge of the facts in issue, the jury is permitted to presume that the testimony of that person would not have been favorable to the party. Kenyon v. Kenyon, 88 Hun, 211, 34 N. Y. Supp. 720, and cases there cited; Thomp. Trials, §§ 989, 1045; Tayl. Ev. (8th Ed.) § 117. The existence of this rule is not disputed, but it is urged that it is not applicable to this case, because the daughter was produced as a witness, and that no presumption arises, from the plaintiff's failure to interrogate her, that her testimony would have been unfavorable to him. I think the rule is as applicable to a case in which a party fails to interrogate a friendly witness, so situated as to be presumed to have knowledge of the existence or nonexistence of the vital facts in issue, as it is to the case of a failure to produce such a witness. Indeed, I think the omission to interrogate a friendly witness in respect to facts presumably within his knowledge is more significant than the failure to call such a person as a witness, and that the presumption that the testimony would not have been favorable to the party's case is stronger than the one which arises from the failure to produce such a person as a witness. Eldridge v. Hawley, 115 Mass. 410, was an action by an indorsee against the maker of a promissory note which had been transferred after it fell due. The defense was that the maker and payee had been partners; that the note was given on a settlement of their accounts, and was procured by fraud. The plaintiff called the payee, who testified that the full amount of the note was due, as shown by the books of the firm, which were then in his possession. The defendant requested the witness to produce the books, but he did not. The court instructed the jury "that, inasmuch as the books are not in the custody of the plaintiff, no inference is to be drawn from the nonproduction of the books, it being in the power of either party to sum-

mon the witness with the books." To this instruction the defendant excepted, and it was held to be error. It was held that, whether an inference should be drawn, from the failure to produce the books, against the credibility of the witness, or against the plaintiff's theory that the amount for which the note was given was shown by the books to have been owing the payee, was a question for the jury. In that case the defendant's counsel could have subpoenaed the payee to produce the books, but he was not bound to make the plaintiff's witness his own; and, if the plaintiff failed to have the books produced, his conduct exposed him to unfavorable inferences, if the jury saw fit to draw them. In the case at bar the defendant was not bound to attempt to prove its defense by the plaintiff's daughter and witness, and the burden was on the plaintiff to interrogate her as to facts presumably within her knowledge, or expose himself to the hazard of unfavorable inferences. The learned judge did not instruct the jury that they were required to presume that the testimony of the daughter would not have been favorable to the plaintiff, had she been interrogated, but simply that they might take the omission into consideration, in determining how the issue should be decided.

The instruction given was not erroneous, and the order should be affirmed, with costs.

HARDIN, P. J., and ADAMS and GREEN, JJ., concur.

WARD, J. (dissenting). This is an action to recover damages for the alleged negligence of the defendant in running its car against plaintiff's carriage, while upon its track in Rochester, breaking the carriage, and injuring the plaintiff. A trial was had in January, 1894; and upon the trial plaintiff was sworn as a witness in his own behalf, and testified to the collision and to his injuries; that he was riding in a carriage upon one of the streets of Rochester, with his daughter Mary and a grandchild, a little girl of two years, when he came near a steam roller in the street that was blowing off, which frightened his horse, so that the plaintiff had great difficulty in managing him; and, while doing so, he got upon the defendant's track, and was overtaken by the car, his carriage broken, and himself injured, and the horse ran away. He testified that he had no warning; heard no bell rung or any signal from the car behind before it struck him; that his first attention was called to it by screams of people who had noticed the approaching car. Another witness was sworn for the plaintiff as to the accident; and also Mary B. Milliman, the plaintiff's daughter, who was in the carriage with him, was sworn as a witness for the plaintiff, and testified in effect that she was riding with the plaintiff upon this occasion, with her little niece sitting between plaintiff and herself, and observed that the horse was frightened at the steam roller; that she heard no warning of the approaching car, except that she heard voices screaming from behind; that she remembered the shock, the striking of the buggy, but remembers nothing more until she was picked up on a crossing near a gutter. She further described the

condition of her clothing and her condition when she recovered her senses. She was cross-examined by the defendant's counsel as to how she was sitting in the buggy, and if she remembered the horse running across the street, and as to some other matters. The defendant gave the testimony of several witnesses as to the circumstances of the accident, tending to show the defendant's freedom from negligence, and contributory negligence on the part of the plaintiff.

The court, in charging the jury, in referring to the plaintiff's evidence, charged as follows:

"In this case the plaintiff has the burden of proof. He alleges that this accident was caused by the negligence of the motorman, and he is bound to satisfy you of that by a fair preponderance of the evidence; and if you have any question about it, if there is any dispute about it, that dispute must be resolved in favor of the plaintiff before he can recover. That makes it proper that I should call your attention to one aspect of the evidence, although I do not propose to comment upon the evidence, because it is in so small a compass that it is not necessary. It is a rule of law—or a rule which men who have occasion to pass upon the facts may apply, it is more accurate to say, perhaps—that where there is a disputed question of fact, and there is a witness at hand or put upon the stand by one party who knows what the facts are, or may know what the facts are, and that witness is not called by the person to whom he or she is friendly to swear as to what the facts are, it is a rule that the persons who pass upon the weight to be given to the testimony may, if they see fit, assume that the reason why that witness was not asked a question in regard to the matter is because, if she had been asked, she would not have given a favorable answer. That is not a rule of law. It is a rule which you may apply in the examination of the evidence, and the jury are not obliged to apply it unless they see fit. It is a rule, I might say, of common sense, because it is an inference which may properly be drawn under certain circumstances. And whether this is a case to draw that inference, and whether you choose to draw it if it is, is a matter entirely for you. But the rule is there for you to do what you choose with it, in case you choose to do anything."

This was said in reference, as is claimed by the defendant, to the failure of the plaintiff's counsel to ask the daughter as to certain facts that would tend to corroborate the testimony of the plaintiff still further as to what occurred at the time of the accident. This charge was excepted to by the plaintiff, which brings the question before us whether the charge was proper under the circumstances, and, if not, whether it might have tended to influence the verdict of the jury, which was for the defendant.

On failure to produce a witness on the trial of an action by a party seeking to maintain an issue, when it appeared that such witness had knowledge of important facts, and was in the power or under the control of the party maintaining the issue, it has been held under certain circumstances that the jury may be left to infer that such failure to produce such witness was a circumstance to be considered in the disposition of the case, and this by reason of the general rule, "Omnia præsumuntur contra spoliatorem." His conduct is attributed to a supposed knowledge that the truth would have operated against him. 1 Greenl. Ev. § 37.

The cases upon that subject which have been cited by the learned counsel relate to the failure to produce the witnesses upon the trial. No case has been brought to our attention where, on the failure

of a party producing a witness who has been duly sworn upon the trial to ask certain questions perhaps pertaining to the issue, an inference has been permitted against him in consequence of such omission in the disposition of the case; and, if we affirm this judgment, we must hold that such is the case.    It is not perceived upon what principle this contention can rest.    It would seem that all that is required of a party producing a witness is to ask him such questions as he desires to do, calling out such facts as he wishes to establish by the witness, and then turn him over to the opposing party for cross-examination.    The opposing party cannot complain of his own failure to call forth facts which may have been omitted by his adversary.    Such omission may have been caused by inadvertence of counsel; by his ignorance of what the witness really knew.    It may have been caused by a knowledge on the part of the examining counsel of the ignorance of the witness of the fact assumed to be within his knowledge.    The claim that the defendant was not obliged to ask the daughter as to the matter claimed to have been omitted, as she was a hostile witness, cannot avail.    It is the duty of the counsel to elicit the truth from every witness so far as is material to the case.    There was nothing shown in this case to justify the assumption that the witness was hostile to the defendant.    The fact that the witness was related to the plaintiff does not justify the inference that she was hostile to the defendant or would suppress the truth or commit perjury.    The defendant could not, when the witness was upon the stand, refuse to interrogate her upon a material matter, and then contend that a presumption may be indulged in against the other side by reason of such omission.    The law does not go to such an absurd length as that.    It has been well held that the omission of a party to call a witness who might have been called by the other party is no ground for a presumption that the testimony of the witness would have been unfavorable.    Cramer *v.* City of Burlington, 49 Iowa, 213.    Scoville *v.* Baldwin, 27 Conn. 316. For the same reason, no presumption can be indulged against either party when the opportunity to examine a witness who is produced and sworn is open to both parties.

In the case at bar the witness in question found herself in a wagon with a horse, in effect, running away, a little child to care for, and, in the fright and excitement of the occasion, remembered nothing more than what she testified to; and there is no ground for assuming that she did know more than what her attention was called to by the examining counsel in this case.    Therefore, when the court assumes to leave the question to the jury in a closely contested case, where the evidence is conflicting, whether an inference was not created against the plaintiff by the failure of his counsel to ask the daughter certain questions that the defendant assumed that he ought to have asked, and which the defendant failed to ask, it was error that might have influenced the jury against the plaintiff. At least we cannot see that it did not do so; and, as it might have had that effect, the judgment should be reversed.

Flynn *v.* Railroad Co., 50 N. Y. Super. Ct. 375, was an action against contractors, growing out of the construction of a building,

for injuries caused by an accident. The plaintiff asked the trial court to charge that if the defendants have failed to produce witnesses who were in their employ, and were present at the time of the accident, that fact should be taken into consideration by the jury in coming to a conclusion. The court charged, in effect, that they might under certain conditions do so. This was held to be error, for which the judgment was reversed. In Fitzpatrick v. Woodruff, 47 N. Y. Super. Ct. 436, the court left it to the jury to say whether the failure of a party to produce a witness to the transaction, and who was sworn on another trial, could create an inference against him. This was held to be error, and the judgment of the trial court reversed. In Lewis v. Bache, 7 N. Y. Supp. 757, the general term of the New York common pleas held, in an action attacking a general assignment by partners as void for fraud, where promissory notes held by their wives were charged as firm liabilities, and their wives were not called as witnesses to show the bona fides of the assignments, that no inference against the validity of the assignment could be drawn from that fact. In Bleecker v. Johnston, 69 N. Y. 309, in an action against copartners upon an alleged contract of employment, plaintiff and one of the defendants were the only witnesses. Their testimony was directly in conflict. The trial judge charged, in substance, that it was the duty of the defendants to produce the other defendants as a witness, and, not having done so, the jury might infer that his evidence would have been prejudicial to the defendants. This was held to be error. As before stated, these cases all relate to the failure to produce witnesses, and, in so far as they tend to establish a rule as to when the witness must be produced to avoid the inference which the court or jury may draw from the failure to produce the witness, may aid us in the consideration of the question before us. Had the plaintiff failed to produce his daughter upon this trial, and it had appeared that she was present and in condition to have observed what occurred, and was in reach of subpœna, and could have been produced by the plaintiff, the question which the court had in mind in his charge to the jury in this case would have been before us, and the cases cited strictly applicable. But, as we have seen, this is not such a case, and we have considered it upon principle, and we hold that no inference against the plaintiff, under the circumstances, could be reasonably indulged in by the jury, and it was error to charge them to that effect.

These views lead to the conclusion that the judgment should be reversed, and a new trial granted, with costs to abide the event.